## Appeal of KIRK COAL CO.

Docket No. 2879.  Submitted June 15, 1925.  Decided February 15, 1926.

1. An amortization deduction on certain assets acquired by the taxpayer between April 6, 1917, and November 11, 1918, disallowed, since no evidence was presented to show the extent to which they were thereafter employed, or the actual or estimated cost of replacing them under normal postwar conditions.

2. Deduction of certain expenditures allowed as ordinary and necessary business expenses. Other expenditures *held* to be of a capital nature.

3. On the facts stated the taxpayer is not entitled to include in invested capital as paid-in surplus any cash value which a certain lease may have had.

*W. P. Sandidge, Esq.*, and *John A. Wells, C. P. A.*, for the taxpayer.

*A. H. Fast, Esq.*, for the Commissioner.

Before IVINS, MARQUETTE, and MORRIS.

This is an appeal from a deficiency in income and profits taxes for 1918 in the amount of $39,819.99. The taxpayer assigns the following errors: The disallowance of (*a*) an amortization claim of $18,537.82, (*b*) structure repairs of $7,373.30, (*c*) equipment repairs of $3,636.49, (*d*) cost of labor on structure repairs of $2,133.40, (*e*) cost of labor on equipment repairs of $1,807.76, (*f*) exhaustion in the amount of $6,097.83 on a leasehold valued at $152,445.85, (*g*) the inclusion of the above-mentioned leasehold in invested capital, and (*h*) the determination by the Commissioner of a profits tax of 61 per cent under section 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

The taxpayer is a Kentucky corporation, with its principal office at Beech Creek. Throughout the years of its corporate existence it has been engaged in mining and selling coal. Until 1917 the product of its mines had been marketed in a limited territory south of the Ohio River, in States bordering on Kentucky. After this country became an active participant in the World War, and until about November 11, 1918, from 60 to 70 per cent of the coal produced from the taxpayer's mines was sold to common carriers, munitions plants maintained and operated by the Government, and troop-mobilization cantonments.

Prior to 1917 the labor market in the vicinity of the company's mines was such that the taxpayer experienced no difficulty in securing the services of miners. In the fall and winter months, when capacity operations were being carried on, the supply of labor available for the taxpayer's needs was swelled by the addition to its ranks of farmers in the adjacent territory. Available facilities in the immediate neighborhood were ample for the housing of its miners, so that the taxpayer had not found it necessary to construct houses for those employees. It did own, however, eight frame houses which had been constructed prior to April 6, 1917, for the purpose of housing its foremen and clerks.

After this country became involved in the World War the local supply of labor available to the taxpayer began to diminish, and continued to do so because of the drafting of available laborers into the military service and the migration of others to industrial centers until the taxpayer found it necessary to import laborers and construct houses for them. Between April 6, 1917, and November 11, 1918, the taxpayer constructed 35 miners' houses. These houses were of typical mine construction, being built of soft pine lumber, each having four rooms, and resting on brick or wooden pillars. The

total cost of construction was $27,102.32. These houses are still being used, and the taxpayer tries to avoid employing men who will not occupy them. Of the total deduction claimed on account of amortization of war facilities, $9,537.85 represents amortization of the cost of these 35 houses. The balance of the deduction is made up of the following items, all of which were acquired, constructed, erected, or installed during the period April 6, 1917, to November 11, 1918:

|  | Cost. |
|---|---|
| 1 storehouse | $6, 481. 91 |
| 1 car shop | 450. 76 |
| 1 mining machine | 2, 800. 00 |
| 40 mine cars | 3, 980. 00 |
| Copper wire | 805. 79 |

The total deduction claimed on the return for structure repairs amounts to $9,014.09. The Commissioner allowed the deduction in the sum of $1,640.79, and disallowed the remainder, $7,373.30. The amount disallowed by the Commissioner is made up as follows:

| Steel rails for tracks | $4, 901. 40 |
|---|---|
| Iron pipe | 114. 02 |
| Ties for laying tracks | 531. 70 |
| Cinders for roadbed | 30. 00 |
| Spikes | 108. 00 |
| Iron plates | 38. 18 |
| Track repairs | 5. 23 |
| Track inspection | 1. 75 |
| Track rentals | 29. 18 |
| Unidentified expenditures | 1, 613. 84 |
|  | 7, 373. 30 |

The steel rails, costing $4,901.40, the ties, costing $531.70, the cinders, costing $30, and spikes, costing $108, were acquired for the purpose of keeping tracks from main-entry roads in touch with the face of the coal. Their useful life extended over a period of several years.

The iron pipe was acquired at a cost of $114.02 for the purpose of pumping drainage water from the mines. This water is copperas, and iron pipes deteriorate rapidly from contact with it.

Iron plates, acquired at a cost of $38.18, were used for patching screens. Track repairs, track inspection, and track rentals are all items billed by the Louisville & Nashville Railroad for repairs and inspection to surface tracks owned by the taxpayer, and rental on tracks and switches of the railroad company used by the taxpayer.

Of the total amount disallowed by the Commissioner the taxpayer failed to identify items representing an aggregate expenditure of $1,613.84.

The total deduction claimed on the return for equipment repairs amounts to $8,210.60. The Commissioner allowed the deduction in the sum of $4,574.11, and disallowed the remainder, $3,636.49. The amount disallowed by the Commissioner is made up as follows:

| | |
|---|---:|
| Mule | $125. 00 |
| Steel rails and frogs | 1, 234. 65 |
| Sundry items | 1, 725. 30 |
| Unidentified items | 551. 54 |
| Total | 3, 636. 49 |

The mule was acquired at a cost of $125 to replace one which had become crippled and worn out.

The steel rails and frogs were acquired by the taxpayer at a cost of $1,234.65 for the purpose of keeping tracks from main-entry roads in touch with the face of the coal. They had a useful life of several years.

There are approximately 45 items making up the total cost of $1,725 for sundry items. These items are miscellaneous hardware, small tools, repair parts, oils, paints, tar, canvas, etc.

Of the total amount disallowed by the Commissioner the taxpayer failed to identify items representing an aggregate expenditure of $551.54.

The mining properties operated by this taxpayer are owned by the Beech Creek Coal Co. In 1910 these properties were leased by the owner to the Hendrie Coal Co. for a term of 25 years on a royalty basis of 4 per cent of the selling price of all coal mined and sold by the lessee. Considerable development work was done by the lessee; approximately one-half mile of track was laid; tipple, blacksmith shop, and other structures were built; an entry of approximately 1,000 feet was driven, and the mine was producing between 200 and 300 tons of coal per day. The lessee operated the properties until the early part of 1914, when it forfeited the lease. On May 8, 1914, the Beech Creek Coal Co. leased these properties to the taxpayer for a term of 25 years on the same royalty basis as that paid by the former lessee. No consideration was paid by the taxpayer for the lease other than the royalties reserved to the lessor in the lease agreement. At the time this lease was made the capital stock of the taxpayer corporation was owned by L. Z. and H. L. Kirkpatrick, brothers, and C. Kirkpatrick, son of L. Z. Kirkpatrick, while the capital stock of the Beech Creek Coal Co. was owned by L. Z. Kirkpatrick and four of his brothers.

In its return for 1918 the taxpayer included this lease in invested capital at a value of $152,445.85 in the form of a paid-in surplus, and in the same return claimed a deduction from gross income of $6,097.83, or one twenty-fifth of the claimed value, on account of

exhaustion of the lease. The Commissioner disallowed the claimed value of the lease for invested capital purposes, as well as the deduction claimed for exhaustion.

Taxpayer made application to the Commissioner to have its profits-tax liability for the year 1918 determined under the provisions of section 328 of the Revenue Act of 1918. This application was given favorable consideration by the Commissioner, and the profits-tax liability was fixed by him at an amount equivalent to 61 per cent of the net income.

The taxpayer reported a net income of $65,665.34 in its return for 1918, and computed total income and profits taxes thereon of $29,105.75. The Commissioner's action on the deductions claimed by the taxpayer is summarized in the following table:

| Items. | Allowed. | Disallowed. |
|---|---|---|
| (a) Amortization of war facilities | | $18,537.82 |
| (b) Repairs (structures) | $1,640.79 | 7,373.30 |
| (c) Repairs (equipment) | 4,574.11 | 3,636.49 |
| (d) Labor (structures) | 9,951.32 | 2,133.40 |
| (e) Labor (equipment) | 4,893.10 | 1,807.76 |
| (f) Depreciation on leasehold | | 6,097.83 |

During the hearing of this appeal counsel for the Commissioner admitted error with respect to the disallowance of the cost of labor on structure and equipment repairs, and conceded that such amounts thereof as had been disallowed in computing the deficiency constituted proper deductions from gross income as ordinary and necessary business expenses.

#### DECISION.

The deficiency should be computed in accordance with the admissions made by the Commissioner and the following opinion. Final determination will be settled on 15 days' notice, under Rule 50.

#### OPINION.

MORRIS: The taxpayer contends that the assets with respect to which the amortization allowance is claimed are "facilities constructed, erected, installed, or acquired on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war" within the purview of section 234 (a) (8) of the Revenue Act of 1918, and that it is entitled to a reasonable deduction for amortization of the cost of these assets in computing its taxable net income. It has computed the allowance for amortization of the cost of miners' houses by comparison of the actual cost of construction with the estimated cost of replacement under normal postwar conditions, using the ratios in respect of costs of material and labor

determined and published in Treasury Decision 3333. By such comparison the actual cost of construction of 35 houses exceeded the estimated postwar cost of replacement by $9,537.85, which is the amount of the amortization claimed with respect to these houses. It claims an amortization allowance with respect to the other assets in an amount equivalent to 50 per cent of their actual cost. The whole deduction claimed has been disallowed by the Commissioner, on the ground that following the termination of the amortization period the taxpayer continued to use all of these assets in the business to their full capacity.

That the assets upon which amortization is claimed were employed in the business subsequent to the termination of the amortization period is clear, but no evidence has been presented to show the extent to which they were so employed, or the actual or estimated cost of the replacement of these assets under normal postwar conditions.

On the second assignment of error the Commissioner contends that the amount he has disallowed is made up entirely of expenditures for items of a capital nature. We find from the evidence before us, however, that of the total amount disallowed by the Commissioner, $188.36, which was expended for iron pipe, iron plates, track repairs, track inspection, and track rentals, was an ordinary and necessary expense. The assets acquired for the purpose of keeping the tracks from the main-entry roads in touch with the face of the coal, including steel rails, ties, cinders for roadbed, and spikes, totaling $5,571.10, were capital items having a useful life of several years, and therefore the cost thereof is not deductible as an ordinary and necessary expense. *Appeal of Union Collieries Co.*, 3 B. T. A. 540. The items making up the balance of the amount of $1,613.84 disallowed by the Commissioner have not been identified by the taxpayer, and we have no knowledge as to their nature.

The Commissioner disallowed certain expenditures made for equipment repairs on the ground that they were of a capital nature. We find from the evidence before us that of the total amount disallowed by the Commissioner $1,725.30 was expended for ordinary and necessary expense. The deduction of $1,234.65 expended for steel rails and frogs is disallowed for the reasons set forth, respecting similar expenditures under structure repairs. The cost of the mule was a capital expenditure, and therefore not deductible. The items making up the balance of the amount disallowed by the Commissioner of $551.54 have not been identified by the taxpayer, and we have no knowledge as to their nature.

The taxpayer acquired a lease subsequent to March 1, 1913, under the circumstances set out in the findings of fact, without capital outlay. Irrespective of whether the lease had any cash value, the

law does not authorize the inclusion in invested capital as paid-in surplus of the value of an asset acquired as herein set forth.

The taxpayer failed to prove by any competent evidence its allegation that the Commissioner erred in determining its profits-tax liability under the provisions of section 328 of the Revenue Act of 1918 to be an amount equivalent to 61 per cent of the net income.

Our conclusions, therefore, on the issues raised by the taxpayer are as follows: (a) The amortization claim of $18,537.82 should be disallowed, (b) structure repairs of $188.36 should be allowed and $7,184.94 disallowed, (c) equipment repairs of $1,725.30 should be allowed and $1,911.19 disallowed, (d) (e) cost of labor on structure repairs of $2,133.40 and on equipment repairs of $1,807.76 should be allowed on the admission of error by the Commissioner, (f) (g) exhaustion of $6,097.83 on the leasehold and its inclusion in invested capital should be disallowed, and (h) the Commissioner's determination of the profits-tax rate is approved.